IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 21, 2018 Session

## STATE OF TENNESSEE v. MARC K. ELIAZAR

**Appeal from the Circuit Court for Rutherford County**
No. F-76080     Royce Taylor, Judge

————————————————————

### No. M2017-00757-CCA-R3-CD

————————————————————

The Appellant, Marc K. Eliazar, pled guilty in the Rutherford County Circuit Court to possession of one-half ounce or more of marijuana with intent to sell or deliver, a Class E felony, and reserved certified questions of law concerning whether the police officer's dog sniff of his vehicle prolonged the traffic stop and, if so, whether the officer had reasonable suspicion of criminal activity for the dog sniff. Based upon the oral arguments, the record, and the parties' briefs, we affirm the trial court's denial of the motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

M. Jeffrey Whitt and Richard L. Gaines, Knoxville, Tennessee, for the appellant, Marc K. Eliazar.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Jennings Hutson Jones, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

This case relates to a traffic stop of the Appellant and a drug dog's detecting marijuana in the Appellant's vehicle. In November 2015, the Rutherford County Grand Jury indicted the Appellant for one count of possessing one-half ounce or more of marijuana with intent to sell or deliver. Subsequently, the Appellant filed a motion to suppress the evidence obtained during the stop, arguing that the police officer's detaining

him after the stop had concluded so that the dog could sniff the exterior of the vehicle was unlawful.

At the November 30, 2016 suppression hearing, Deputy Mark Gregory of the Rutherford County Sheriff's Department testified that he was a K-9 patrol officer. He described his dog, named "Balu," as a "dual purpose K-9" trained to work in narcotics, patrol, and traffic. The dog was certified by the National Narcotic Detector Dog Association to "alert" on marijuana, cocaine, heroin, and methamphetamine, and the dog was recertified every year. Deputy Gregory said he and the dog trained together at least four hours every week.

Deputy Gregory testified that sometime between 7:00 p.m. and 10:00 p.m. on November 20, 2015, he was traveling "outbound" on Lebanon Highway and saw a vehicle approaching him from the opposite direction. The vehicle was "going pretty fast," so Deputy Gregory looked at his radar. The posted speed limit in the area was fifty-five miles per hour, but the radar showed the vehicle was traveling eighty-four miles per hour. After the vehicle passed Deputy Gregory, he turned his patrol car around, caught up to the vehicle, and turned on his blue lights and siren. The vehicle pulled over.

Deputy Gregory testified that he approached the vehicle and that "you don't normally see people doing 85 miles an hour unless there is -- I was thinking maybe there was a medical emergency or something." The Appellant was sitting in the driver's seat. Deputy Gregory asked the Appellant to get out of the vehicle, and they walked back to Deputy Gregory's patrol car. Deputy Gregory said that the Appellant was "extremely nervous" but that "if you get pulled over by the police doing 85 in a 55 miles an hour zone, you are going to be nervous." Deputy Gregory made "casual conversation" with the Appellant and eventually told the Appellant that he was going to write the Appellant a warning citation "just to slow it down." Deputy Gregory stated, "Usually, when you tell somebody that, their nervousness subsides. I have been through numerous DA schools and interdiction schools. And one thing they teach us is that once you -- it's supposed to deescalate their nervousness -- you are supposed to see changes." However, the Appellant's nervousness did not change "at all." Deputy Gregory told the Appellant to calm down, but the Appellant was "still amped up," so Deputy Gregory "took that as [a sign] there was something else maybe going on with him."

Deputy Gregory testified that while he was writing the warning citation, he received additional "ques" from the Appellant. Specifically, the Appellant claimed that he had left Knoxville two hours previously, but Deputy Gregory did not think the Appellant could drive from Knoxville to Murfreesboro in two hours. Therefore, Deputy Gregory considered the Appellant's statement to be false. The Appellant also was

- 2 -

driving a rental vehicle. He told Deputy Gregory he was returning to his apartment in Murfreesboro, but his driver's license did not show a Murfreesboro address.

Deputy Gregory testified that he asked the Appellant for consent to search the vehicle but that the Appellant refused. Deputy Gregory told the Appellant that he had the right to refuse consent. However, Deputy Gregory "advised him that since I had a K-9 I was going to run the narcotics K-9 around the vehicle. If he alerted, I was going to search the vehicle. And if not, then I would just give him the written warning as I promised him and he would be on his way." Deputy Gregory stopped writing the warning citation, got Balu out of his patrol car, and approached the passenger side of the Appellant's vehicle. The dog immediately alerted on the rear door. Deputy Gregory walked the dog to the front of the vehicle, and the dog alerted on the driver's door. Deputy Gregory put the dog back into his patrol car and advised the Appellant that he was going to search the vehicle. The Appellant told Deputy Gregory that some marijuana was inside the door to the fuel tank. Deputy Gregory stated that based on his "training and experience at interdiction schools," he knew that drug traffickers usually hid a small amount of drugs somewhere so that the officer would find the drugs and let the trafficker go. Therefore, Deputy Gregory decided to search the interior of the vehicle. A backpack on the back seat contained a large amount of marijuana, and the Appellant admitted that the backpack was his. Deputy Gregory opened the vehicle's fuel door and found a latex glove containing a small amount of marijuana. He never finished writing the warning citation.

On cross-examination, Deputy Gregory testified that he did not know the Appellant before the traffic stop. After he stopped the Appellant, he had the Appellant get out of the vehicle, which was Deputy Gregory's standard procedure, and asked for the Appellant's driver's license, rental car information, and insurance information. The Appellant was cooperative and provided all of the information Deputy Gregory requested, so Deputy Gregory decided to write him a warning citation. Deputy Gregory acknowledged that it was within his discretion to write a warning citation and explained that "because of [Mr. Eliazar's] speed and him being 30 miles over, we are required to write a reckless driving ticket. So, I didn't want to make Mr. Eliazar have a reckless driving on his history for a simple mistake. Everybody makes mistakes. Everybody speeds." Deputy Gregory did not conduct a records check to see if the Appellant had any outstanding warrants.

Deputy Gregory testified that while he was writing the warning citation, he began questioning the Appellant "to find out why he was going 85." He asked the Appellant where the Appellant was coming from, and the Appellant said Knoxville. Deputy Gregory said that he thought the time needed to drive from Knoxville to Murfreesboro was four hours but that he did not know the mileage. At that point, the trial court stated,

"I'll interject here. I drove to law school from here to Knoxville for three years every week. And I made it before the interstate was completed in two and a half hours. I don't think that's unusual. So, I wouldn't expect you to get a ticket for that." Deputy Gregory then stated, "Personally, I thought it was a little fast and incomprehensible that he could be here from leaving Knoxville in just two hours from where he was."

Deputy Gregory acknowledged testifying at the Appellant's preliminary hearing that the Appellant was nervous, "started to sweat a little bit," and would not make eye contact. Deputy Gregory said that "[t]hose [were] some of [the ques]" he relied on for reasonable suspicion and that "this is almost a year ago. And I can't honestly remember every single one." While he was writing the warning citation, he continued asking the Appellant questions, including whether the Appellant would consent to a search of the vehicle. He acknowledged that he asked for consent to search "right in the middle of writing that warning." When the Appellant denied consent, Deputy Gregory told the Appellant that he was going to walk the drug dog around the vehicle. Deputy Gregory stopped writing the warning citation in order to get Balu out of his patrol car, and he acknowledged that "it only took a few minutes" to conduct the dog sniff. Deputy Gregory then searched the vehicle and found the marijuana. He did not arrest the Appellant on November 20, 2015.

Deputy Gregory acknowledged that the Appellant's traffic stop was video recorded from his patrol car. However, the audio recorder "was either dead or it wasn't working right," so the video did not have any sound. Defense counsel introduced a copy of the video into evidence.

The video shows that Deputy Gregory turned on his blue lights at 9:13:35 p.m. and that the Appellant immediately pulled over. Deputy Gregory approached the Appellant's car at 9:14:16 p.m., and he and the Appellant walked back to his patrol car at 9:14:43 p.m. The Appellant took his driver's license out of his wallet and handed it to the officer, and Deputy Gregory talked with him. At 9:15:29 p.m., Deputy Gregory and the Appellant walked to the passenger side of the patrol car and mostly out of the video camera's view. However, Deputy Gregory can be seen putting some papers on the hood of his patrol car at 9:15:48 p.m. and can be seen writing on the hood of his patrol car at 9:16:19 p.m. Three minutes later, at 9:19:18 p.m., Deputy Gregory directed the Appellant to stand in front of his patrol car. The officer then walked around the Appellant to the driver's side of the patrol car and out of the camera's view. Deputy Gregory and Balu appeared on the passenger side of the patrol car at 9:20:38 p.m., and

they immediately walked toward the Appellant's car. Deputy Gregory put Balu back into his patrol car at 9:21:15 p.m.[1]

At the conclusion of Deputy Gregory's testimony, defense counsel advised the trial court that pursuant to Rodriguez v. United States, 135 S. Ct. 1609 (2015), an officer could not prolong a traffic stop in order to run a drug dog around a vehicle unless the officer had probable cause to do so. Defense counsel contended that Deputy Gregory did not have probable cause to prolong the stop in this case and, therefore, that the evidence found in the Appellant's car had to be suppressed.

In a written order, the trial court gave a factual account of the evidence presented at the suppression hearing, noting that Deputy Gregory talked with the Appellant and asked for consent to search the vehicle while the officer was writing the warning citation. The court stated that "the officer never finished the warning, but rather decided to run the K9 officer around the vehicle" and that the dog sniff "took roughly two (2) minutes."

The trial court found that Deputy Gregory had probable cause to conduct the traffic stop because the Appellant was speeding. The court then addressed the legality of the dog sniff. The court found that "Rodriguez dealt directly with the situation in this case" and stated that "[t]he question, as it stands in light of Rodriguez, is whether the dog-sniff search added any time whatsoever to the traffic stop." The court concluded that although the dog sniff took a mere two minutes,

> it did indeed add time to the traffic stop beyond what was necessary for Officer Gregory to write Defendant a citation. Officer Gregory, instead of simply finishing the ticket and allowing Defendant to leave, had to return to his patrol car, retrieve his K9, perform the dog-sniff twice, and then speak with Defendant. While this extenuation may well be a minor one, it nonetheless extended the search beyond the time necessary to simply write Defendant a warning.

The court found, though, that the Appellant "exhibited numerous cues" that gave Deputy Gregory reasonable suspicion of criminal activity. Specifically, the court found that the Appellant's "nervousness, his high rate of speed, and Officer Gregory's reasonable belief of the given timeline - although possibly an erroneous disbelief" gave Deputy Gregory reasonable suspicion of criminal activity to prolong the stop for the dog sniff. Thus, the court denied the Appellant's motion to suppress.

---

[1] Most of the dog sniff was obstructed by the Appellant, who was standing directly in front the patrol car's video camera.

The Appellant pled guilty to possession of one-half ounce or more of marijuana with intent to sell or deliver, a Class E felony, and received a one-year sentence to be served on supervised probation. Pursuant to the plea agreement, he reserved the following certified questions of law:

I. Whether the scope of the detention following the traffic stop for speeding was unnecessarily exceeded/extended by Officer Gregory, without warrant, reasonable suspicion or probable cause, in violation of the Defendant's rights under Article I, Section 7 of the Tennessee Constitution and the United States Constitution, Fourth Amendment when Officer Gregory ran his drug dog around the defendant's vehicle.

II. Whether the trial court erred in finding that the testimony of Officer Gregory established reasonable suspicion to justify a warrantless search of the defendant's vehicle.

III. Whether the trial court erred by relying upon the subjective beliefs of Officer Gregory, who erroneously believed the defendant to be un-credible, in finding that reasonable suspicion existed to support a warrantless search of the defendant's vehicle.

IV. Whether the trial court erred by relying upon Officer Gregory's claim that the defendant was traveling at a high rate of speed as a basis for reasonable suspicion for a warrantless search, when the speeding was the underlying cause for the original stop.

V. Whether the subsequent search of the defendant's vehicle, or any subsequent consent to search that vehicle, occurring after the unlawful, extended detention of the defendant would be "fruits of the poisonous tree" and inadmissible.

## II. Analysis

Initially, we note that although the State consented to the reservation of the certified questions for appeal and agreed that the issues were dispositive of the case, the State now claims that the certified questions do not comport with the requirements of State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988). Tennessee Rule of Criminal

Procedure 37(b)(2)(A) provides that an appellant may appeal from any judgment of conviction occurring as a result of a guilty plea if the following requirements are met:

>  (i)  the judgment of conviction or order reserving the certified question that is filed before the notice of appeal is filed contains a statement of the certified question of law that the defendant reserved for appellate review;

>  (ii)  the question as stated in the judgment or order reserving the certified question identifies clearly the scope and limits of the legal issue reserved;

>  (iii)  the judgment or order reserving the certified question reflects that the certified question was expressly reserved with the consent of the state and the trial court; and

>  (iv)  the judgment or order reserving the certified question reflects that the defendant, the state, and the trial court are of the opinion that the certified question is dispositive of the case[.]

In Preston, our supreme court explicitly provided prerequisites to appellate consideration of a certified question of law under Rule 37(b)(2). The court stated:

> Regardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise, the final order or judgment from which the time begins to run to pursue at T.R.A.P. 3 appeal must contain a statement of the dispositive certified question of law reserved by defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved.

Id. at 650.

In the instant case, the State argues that the Appellant's certified questions are overly-broad and that some of them are not dispositive. The Appellant responds that "[e]ach question specifically states the issue to be decided" and that "[f]rom the five questions, this Court can easily determine the 'scope and limits of the legal issues resolved.'" We agree with the Appellant. The Appellant reserved the certified questions by including a reference to an "addendum" on the judgment of conviction. The three-page addendum sets out a brief recitation of the facts and the parties' arguments at the

suppression hearing, including the Appellant's reliance on Rodriguez; lists the issues; and provides that the issues are dispositive. We think that the issues are dispositive of the case and do not find them to be overly-broad. Accordingly, we conclude that the Appellant properly reserved the certified questions.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review both questions of law and the trial court's application of law to the facts purely de novo. See State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009); State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures. In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009). Stopping an automobile without a warrant and detaining its occupants constitutes a seizure. State v. Brotherton, 323 S.W.3d 866, 870 (Tenn. 2010). Therefore, authorities must act reasonably when they initiate a traffic stop and have probable cause or reasonable suspicion to believe that a traffic violation has occurred. Id. The Appellant does not contest that Deputy Gregory had probable cause to stop him for speeding. See State v. Vineyard, 958 S.W.2d 730, 736 (Tenn. 1997).

That said, an investigation during a traffic stop requires that the officer's actions be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). Moreover, the detention "must be temporary and last no longer than necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). Our supreme court has held that a dog sniff is not a "search" under the Fourth Amendment and is reasonable if performed during the time necessary to effectuate the traffic stop. State v. England, 19 S.W.3d 762, 766-68 (Tenn. 2000). Likewise, the United States Supreme Court has stated that a dog sniff on the exterior of a defendant's car "while he was lawfully seized for a traffic violation" did not rise to the level of a constitutionally cognizable infringement. Illinois v. Caballes, 543 U.S. 405, 409 (2005).

Accordingly, in dog sniffing cases, the constitutional inquiry focuses not upon the means used to detect the presence of narcotics but rather the time it takes to conduct the dog's sweep of the vehicle. An otherwise lawful canine sweep that is ancillary to a legitimate traffic stop may constitute an unlawful search if the suspect is detained beyond the time necessary to complete the traffic stop.

State v. Harris, 280 S.W.3d 832, 841 (Tenn. Crim. App. 2008).

In Rodriguez, a police officer conducted a lawful traffic stop of the defendant after observing the defendant veer onto the shoulder of the highway. 135 S. Ct. at 1612. The officer approached the defendant's vehicle and asked for the defendant's license, registration, and proof of insurance, and the defendant provided the information. Id. at 1613. The officer returned to his patrol car, called for a second officer, and began writing a warning ticket for the defendant's driving on the shoulder of the road. Id. The officer completed the written warning and gave it to the defendant. Id. At that point, the officer asked for permission to walk his drug dog around the defendant's vehicle, but the defendant refused. Id. The officer retrieved the dog from his patrol car and led the dog twice around the defendant's vehicle. Id. The dog alerted to drugs, and a search of the vehicle resulted in the officer's finding a large bag of methamphetamine. Id.

The defendant filed a motion to suppress the evidence on the basis that the officer prolonged the stop without reasonable suspicion to conduct the dog sniff. Id. The district court denied the motion, concluding that the seven to ten minutes that were added to the stop by the sniff "'was not of constitutional significance.'" Id. at 1614. The Eighth Circuit Court of Appeals affirmed, concluding that the seven- or eight-minute delay "constituted an acceptable 'de minimis intrusion on Rodriguez's personal liberty.'" Id. at 1614. The United States Supreme Court granted certiorari "to resolve a division among lower courts on the question [of] whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." Id.

The Supreme Court stated that authority for the seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S. Ct. at 1614. Those tasks include checking the driver's license, conducting a warrant check against the driver, and inspecting the vehicle's registration and proof of insurance. Id. at 1615. While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615. The court explained that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff

'prolongs'—i.e., adds time to—'the stop[.]'" Id. at 1616 (internal citations omitted). When a police officer extends a traffic stop, absent reasonable suspicion, to conduct a dog sniff, the sniff violates constitutional protections against unreasonable seizures. Id. The court concluded that the dog sniff of Mr. Rodriguez's vehicle prolonged the stop, and the court remanded the case to the court of appeals in order for that court to determine whether reasonable suspicion existed for the dog sniff. Id. at 1616-17.

Turning to the instant case, the trial court determined that Deputy Gregory's dog sniff prolonged the Appellant's traffic stop. On appeal, the Appellant contends that "the facts in Rodriguez closely mirror the stop conducted by Officer Gregory" and that the trial court correctly concluded the dog sniff added time to the stop. We disagree with the trial court and the Appellant. Unlike the dog sniff in Rodriguez, the dog sniff in this case occurred before the officer finished writing the warning citation. Indeed, the video shows that Deputy Gregory had been writing the warning citation for only three minutes when he stopped writing in order to get Balu out of his patrol car. The subsequent dog sniff then took just two minutes.

Recently, the Illinois Court of Appeals addressed whether a dog sniff conducted prior to the completion of the ticket prolonged the traffic stop and concluded, "If drugs are detected at a time when the officer would otherwise still have been writing a ticket, we fail to see how, at that point, any time has been added to the stop. Beyond that point, further detention is justified by the detection of drugs." People v. Ken Heritsch, No. 2-15-117, 2017 WL 6506600, at *4 (Ill. App. Ct., Dec. 20, 2017). We agree with the reasoning of the Illinois Court of Appeals. It was the State's burden to show that the dog sniff did not prolong the traffic stop. See State v. Nicholson, 188 S.W.3d 649 656-57 (Tenn. 2006). The State did not question Detective Gregory about the amount of time needed to write a warning citation or the amount of time it would have taken him to have completed the Appellant's citation. On cross-examination, though, Detective Gregory acknowledged that he was "right in the middle of writing that warning" when he asked the Appellant for consent to search, the Appellant denied consent, and he got Balu out of his patrol car. Therefore, we have no hesitation in concluding that Deputy Gregory, who had been writing the warning citation for only three minutes when he interrupted his writing to get Balu out of his patrol car, would have been unable to complete the citation during the subsequent two-minute dog sniff. Upon completing the citation, Deputy Gregory then had to give it to the Appellant and return the Appellant's driver's license and documents to him. In other words, Deputy Gregory would not have completed the stop before the dog alerted to the marijuana in the car. See id. at *5. We note that less than eight minutes elapsed from the time Deputy Gregory stopped the Appellant at 9:13:35 p.m. and completed the dog sniff at 9:21:15 p.m. Thus, with regard to the Appellant's first certified question, we conclude that the dog sniff did not prolong the

stop. Accordingly, the trial court should have denied the Appellant's motion to suppress on that basis, and the Appellant is not entitled to relief.

We could end our analysis there. However, given the possibility of further appellate review, we will address the Appellant's remaining certified questions regarding whether Deputy Gregory had reasonable suspicion of criminal activity for the dog sniff.

"Reasonable suspicion" for a detention is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances, including "objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). Furthermore, the court may consider "rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Id. A defendant's nervousness, combined with other suspicious factors, can support an officer's reasonable suspicion of criminal activity so that the officer can expand the scope of a traffic stop to investigate further. State v. Eugene Taylor, No. E2010-01817-CCA-R3CD, 2011 WL 2120087, at *11 (Tenn. Crim. App. at Knoxville, May 20, 2011).

The Appellant first argues that the trial court erroneously relied on the officer's "subjective, mistaken belief" that the Appellant could not drive from Knoxville to Murfreesboro in two hours. The trial court specifically addressed this issue in its written order, explaining as follows:

> Defendant told the officer he made the trip in roughly two (2) hours, but Officer Gregory testified that he believed the trip would take around four (4) hours. The time for the trip was a topic of discussion at the hearing, but no matter how long it actually took, Officer Gregory found the story to be un-credible.

(Emphasis added.) In a footnote, the trial court noted that Google Maps estimated the duration of a trip from Knoxville to Murfreesboro to be about three hours, depending on the precise arrival and departure points.

- 11 -

Even if Deputy Gregory was mistaken in his belief that the Appellant's trip from Knoxville to Murfreesboro would have taken four hours, "[a]n officer's mistake of fact will not likely negate a finding of reasonable suspicion, so long as that mistake is objectively reasonable." State v. Dylan M. Yacks, No. E2013-02187-CCA-R3-CD, 2014 WL 7527103, at *4 (Tenn. Crim. App. at Knoxville, Jan. 13, 2015). Therefore, the question is whether it was objectively reasonable for a law enforcement officer to think it would take a person, sometimes traveling eighty-four miles per hour, four hours to drive from Knoxville to Murfreesboro. At the suppression hearing, the trial judge found that Deputy Gregory was mistaken about the drive time from Knoxville to Murfreesboro. However, the judge had personal knowledge about the length of the trip because he had driven from Knoxville to Murfreesboro many times during law school. Given that the normal driving time from Knoxville to Murfreesboro was about three hours, we cannot say that Deputy Gregory's belief of four hours was objectively unreasonable. In any event, the Appellant's claim of driving from Knoxville to Murfreesboro in just two hours was only one part of his travel "story." As noted by the trial court, the Appellant's excessive speed also piqued Deputy Gregory's suspicion. Therefore, we turn to the Appellant's next claim: Whether the trial court erred by considering his excessive speed as grounds for reasonable suspicion for the dog sniff.

The Appellant contends that because the basis for the traffic stop was his traveling eighty-four miles per hour in a fifty-five-mile-per-hour speed zone, Deputy Gregory then could not use his "high rate of speed" as a basis for reasonable suspicion of criminal activity. Again, we disagree with the Appellant. Deputy Gregory testified that the posted speed limit in the area was fifty-five miles per hour. The Appellant was not just speeding, he was speeding almost thirty miles per hour over the posted limit. Deputy Gregory stated that the Appellant's high rate of speed was unusual "unless there is . . . a medical emergency or something." The Appellant had no medical emergency or any other explanation for his high rate of speed. Thus, we conclude that while Deputy Gregory could not consider the Appellant's speeding alone as reasonable suspicion of criminal activity, the officer could consider the Appellant's high rate of speed along with other factors as reasonable suspicion of criminal activity.

In sum, the trial court properly considered Deputy Gregory's mistaken belief that the Appellant could not have driven from Knoxville in just two hours and properly considered the Appellant's excessive speed in its determination of whether Deputy Gregory had reasonable suspicion of criminal activity. Moreover, the trial court did not err by concluding that those two "ques," along with the Appellant's nervousness, provided the officer with reasonable suspicion to prolong the stop for the dog sniff.

## III.  Conclusion

Based upon the record and the parties' briefs, we affirm the trial court's denial of the motion to suppress.

_____

NORMA MCGEE OGLE, JUDGE